**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

RUBEN R. HERRERA,

Petitioner,

v. No. CIV 97-542 JP/LFG

TIM LEMASTER, Warden,
New Mexico State Penitentiary,
et al.,

Respondents.

**MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDED DISPOSITION**[1]

**Findings**

**Procedural Background**

1. This § 2254 Petition initially brought by Ruben Robert Herrera ("Herrera") on April 22, 1997, is now before the Court upon remand by the Tenth Circuit Court of Appeals. On August 23, 2002, the Tenth Circuit vacated the district court's prior judgment in this matter and remanded it with directions to assess the harmlessness of the Fourth Amendment violation under the Brecht

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

standard in light of the entire state court record. Herrera v. LeMaster, 301 F.3d 1192, 1200 (10th Cir. 2002), *cert. denied*, 123 S.Ct. 1266 (2003).

2. Herrera's trial in New Mexico state court lasted from August 22 through part of August 27, 1983 [corrected trial tapes, filed January 5, 2001]. He was convicted of first degree murder and aggravated assault with a firearm and sentenced to life in prison for the murder, eighteen months for the aggravated assault and one year for the firearm enhancement. Herrera, 301 F.3d at 1194.

3. On direct appeal, Herrera argued that evidence was seized from his residence under an invalid search warrant and that the evidence was then admitted at trial in violation of his Fourth Amendment rights. The New Mexico Supreme Court agreed with Herrera, finding that "[t]here were insufficient facts to show probable cause to search the premises described for evidence of [the] murder and that the search was, therefore, illegal. State v. Herrera, 102 N.M. 254, 694 P.2d 510, 514 (N.M.), *cert. denied*, 471 U.S. 1103 (1985). However, the state Supreme Court, in applying New Mexico law, concluded that the admission of the illegally seized items was harmless error. Herrera, 301 F.3d at 1194; State v. Herrera, 694 P.2d at 513-515.

4. On April 22, 1997, Herrera, a state prisoner, brought his § 2254 petition [doc. 1] claiming that his constitutional rights were violated by the admission at trial of illegally obtained evidence and that the State Supreme Court erred in holding that the admission of the unlawfully seized evidence was harmless.

5. The § 2254 Petition was referred to the Magistrate Judge, and on August 13, 1997, this Court issued proposed findings and the recommendation that the petition be denied and the case be dismissed, with prejudice. [Doc. 8.] The Magistrate Judge held that the state court's harmless

error determination was entitled to a presumption of correctness and alternatively concluded that any error was harmless under the standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710 (1993), *reh'g denied*, 508 U.S. 968 (1993). Herrera filed lengthy objections to the proposed recommendation. [Docs. 9 and 10.] On February 6, 1998, the District Court issued an Order adopting the Magistrate Judge's findings and recommended disposition. [Doc. 11.] On March 2, 1998, Herrera filed a Notice of Appeal. [Doc. 12.]

6. Herrera argued to the Tenth Circuit that the New Mexico Supreme Court's failure to apply the constitutional standard of harmless beyond a reasonable doubt set out in Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824 (1967), *reh'g denied*, 386 U.S. 987 (1967), resulted in a decision that was contrary to, or involved an unreasonable application of that Supreme Court decision.

7. On September 14, 2000, the Tenth Circuit vacated the denial of Herrera's habeas petition. Herrera v. LeMaster, 225 F.3d 1176 (10th Cir. 2000). The Tenth Circuit found that because the state supreme court had not applied the Chapman standard, Herrera did not receive full and fair consideration of his claim. The Tenth Circuit further explained that when a state court fails to apply the proper constitutional standard of harmless error, the standard to be applied on federal habeas review is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Id. at 1179 (*citing* Brecht, 507 U.S. 637).

8. While the Magistrate Judge had alternatively concluded that any error was harmless under Brecht, the Magistrate and District Court accepted the state court's analysis without independently reviewing the state court record. Id.. Thus, the Tenth Circuit held that the district court erred in giving a presumption of correctness to the state court's harmless error analysis and in

further assessing the error without a review of the state court record. Id. The Tenth Circuit remanded with instructions for the trial court to review the case under the Brecht standard.

9. Herrera, however, sought *en banc* review, arguing that the Brecht harmless error standard did not apply to a habeas action that is governed by the AEDPA, when the state court failed to perform the harmless error analysis under Chapman.[2] Herrera, 301 F.3d at 1193. Under Chapman, the harmless error review consists of determining whether the error "was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. at 24. Herrera contended that on remand, the district court should apply the more rigorous harmless error standard[3] set out in Chapman. The Tenth Circuit granted rehearing *en banc* and held that the standard set out in Brecht, rather than Chapman, was the appropriate one to use in these circumstances. Herrera, 301 F.3d at 1194. The Court noted that the United States Supreme Court subsequently indicated that a federal habeas court is to apply the Brecht standard to a habeas petition governed by AEDPA even under circumstances where the state court did not apply Chapman in its harmless error review. Id. at 1199 (*citing* Penry v. Johnson, 532 U.S. 782, 121 S.Ct. 1910 (2001)).

10. The Court has now carefully reviewed approximately 40 trial tapes from Herrera's August 1983 trial, over 500 pages of trial transcripts, and the parties' pertinent pleadings, including Herrera's objections and summation of the evidence at trial. The Court has applied the Brecht standard, in accordance with the Tenth Circuit's instructions, and recommends finding that the

---

[2]Herrera's federal habeas petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, and thus, those provisions govern the scope of review of his § 2254 petition.

[3]The Tenth Circuit recognized that the Brecht standard is less stringent than that in Chapman, but noted that it still was "appropriately demanding." Herrera, 301 F.3d at 1197 (*quoting* Brecht, 507 U.S. at 641) (Stevens, J., concurring). Brecht requires an explanation for why the errors were harmless, requires a habeas court to review the entire record *de novo* in determining whether the error influenced the jury's deliberations and leaves considerable latitude for the exercise of judgment by federal courts. Id. (internal citation omitted).

admission at trial of the unlawfully seized evidence did not have a substantial and injurious effect or influence on the jury's verdict. Thus, the Court recommends finding that Herrera is not entitled to habeas relief and that his § 2254 petition be dismissed, with prejudice.

## Factual Background

11. The following evidence was presented at trial. On the evening of November 4, 1982, Herrera was at the El Nido bar and nightclub in Las Vegas, New Mexico. Phillip Arellanes ("P. Arellanes") and the deceased, Leroy Lovato ("Lovato"), arrived at El Nido at about 11 p.m. that night, left and then returned to the bar again later. [Tape 4 of 8, 8/23/83, 1:00, 6:00, 17:00.[4]] All of these men had been drinking to some extent. On that evening, P. Arellanes had a cast on his leg. [Tape 5 of 8, 8/23/83, 2:36.] Herrera was wearing a maroon sports jacket, a maroon and white shirt and slacks. [Tape 4 of 8, 8/23/83, 29:00; T. 5 of 8, 8/23/83, 10:00; T. 7 of 8, 8/23/83, 30:15; T. 1 of 6, 8/24/83, 44:50; T. 3 of 6, 8/24/83, 26:30; T. 6 of 6, 8/24/83, 32:10.]

12. At about 12:40 a.m. on November 5, P. Arellanes and Lovato were talking in the back part of the bar when Nora Trujillo ("Trujillo") confronted P. Arellanes and slapped him. [Tape 4 of 8, 8/23/83, 18:30, 19:50; T. 3 of 6, 8/26/83, 32:55-41:15.] By her own admission, Trujillo was a little intoxicated. [T. 3 of 6, 8/26/83, 41:15.] A verbal argument ensued between P. Arellanes and Trujillo until Trujillo left the bar with a friend. P. Arellanes and Lovato overheard a verbal argument or discussion between Herrera and David Chavez ("Chavez") at the front part of the bar, after Trujillo left. [Tape 4 of 8, 8/23/83, 21:45, 23:19.] Chavez appeared to be very drunk. [Id., 21:45; T. 6 of

[4]The Court used a Sony bm-75 transcriber/dictator in reviewing the tapes. Each tape had approximately 47:00 counts. The initial set of tapes filed with the Court was defective. Supplemental tapes were provided. Tape 3 of 8 for 8/23/83 was missing and could not be provided. The Court was able to review the previously submitted tape 3 of 8 for 8/23/83, which was cut short. Thus, a short part of P. Arellanes' direct testimony could not be reviewed. In addition, a portion of the State's expert, Dr. Peele, was difficult to review. [Tape 2, 8/25/83.] All references to the locations of testimony on these tapes are approximate.

8, 8/23/83, 1:00.] P. Arellanes recognized Herrera at this point as someone with whom he had had a prior disagreement at a different bar, but could not recall Herrera's correct name. [T. 5 of 8, 8/23/83, 14:00; T. 6 of 8, 8/23/83, 23:00.] Lovato, a cousin of Chavez, warned Herrera not to "hassle" Chavez. [Tape 4 of 8, 8/23/83, 24:40; T. 6 of 8, 8/23/83, 5:00.] Herrera told Lovato not to get involved, and P. Arellanes pulled Lovato aside and also told him not to get involved with Herrera in this matter. [Id.] Chavez testified that he was intoxicated on the evening in question but that he remembered having a small verbal argument with Herrera at the bar. [T. 2 of 6, 8/26/83, 39:45.] He did not recall, however, that Lovato interceded on his behalf, although he testified that Lovato approached him and shook his hand. [T. 2 of 6, 8/26/83, 41:20.]

13. Lovato then attempted to shake hands with Herrera, but Herrera refused his hand. P. Arellanes and Lovato backed off, and Herrera was seen leaving the bar alone. P. Arellanes and Lovato remained at the bar. Two women who were cousins, Debra Farrell ("Farrell") and Denise Martinez ("Martinez"), also were at El Nido. [T. 4 of 8, 8/23/83, 33:05; T. 7 of 8, 8/23/83, 10:00; T. 1 of 6, 8/24/83, 40:00.] P. Arellanes was interested in asking the women to go party with him and Lovato. [Id.] The two women left the bar, and P. Arellanes and Lovato followed them out the door. [Id.; T. 7 of 8, 8/23/83, 18:50-23:35.] The four talked outside the bar, at which point P. Arellanes saw Herrera approaching them from the corner of his eye. [Tape 4 of 8, 8/23/83, 39:00.]

14. The area outside the bar was described as well lit by street lights in the near vicinity and a nearby mini-mart. [Tape 5, 8/22/83, 39.14; T. 5 of 8, 8/23/83, 19:20; T. 7 of 8, 8/23/83, 37:40.] P. Arellanes said something to the effect of "here he comes Leroy" to Lovato. [Tape 5 of 8, 8/23/83, 2:36; T. 7 of 8, 8/23/83, 26:25.] Herrera was heard to have called "Indio" which was Lovato's nick name. [T. 7 of 8, 8/23/83, 26:25.] Lovato asked Martinez to stand by him explaining

that "this guy wanted to throw blows at me." [T. 7 of 8, 8/23/83, 26:75; T. 1 of 6, 8/24/83, 44:50.] The women saw someone approaching the group, and elected to leave at this point. [Id.; T. 1 of 6, 8/24/83, 44:50; T. 2 of 6, 8/24/83, 17:05.] They turned their backs as they walked away. As Herrera approached, P. Arellanes said to him that Lovato had no "hassles" with him. [T. 5, 8/23/83, 2:36.] Herrera told P. Arellanes to stay out of the matter. [Id.] Some of these verbal exchanges were in Spanish. Lovato had both hands in his pockets then and told Herrera that he had "no hassles with you," at which point Lovato attempted to shake hands again with Herrera using his right hand. [T. 5 of 8, 8/23/83, 3:00.]

15. P. Arellanes saw Herrera pulled out a black automatic gun and shoot Lovato in the neck. [T. 6 of 8, 8/23/83, 25:50.] P. Arellanes leaned down to Lovato who had fallen to the ground with his left hand still in his pocket. [Tape 6 of 8, 8/22/83, 33:00; T. 5 of 8, 8/23/83, 3:00; T. 3 of 6, 8/26/83, 26:15.] Blood was shooting from Lovato's neck. Herrera had a gun on P. Arellanes and told P. Arellanes not to say anything or Herrera would kill Arellanes. Farrell and Martinez did not see the shooting but they heard a noise that caused them to immediately turn around where they saw Lovato lying on the ground bleeding. [T. 7 of 8, 8/23/83, 26:75; T. 8 of 8, 8/23/83, 11:30.] Farrell testified that she heard the shot and within 2 to 3 seconds had turned to see Lovato on the ground. [T. 8 of 8, 8/23/83, 8:40.] Martinez testified that she saw Lovato's blood gushing and steam rising. [T. 1 of 6, 8/24/83, 44:50; T. 2 of 6, 8/24/83, 20:00.] The women had taken five or six steps away from the scene when they heard the shot and turned back. [T. 1 of 6, 8/24/83, 44:50; T. 2 of 6, 8/24/83, 35:30.]

16. Herrera left the scene on foot. The two women both saw him walk away and Martinez later identified him as the man who was approaching their group. [T. 1 of 6, 8/24/83, 47:50.] P.

Arellanes did not look up after having the gun pointed at him. [T. 6 of 8, 8/23/83, 27:60.] Farrell observed Herrera (she did not know Herrera at this point) [T. 7 of 8, 8/23/83, 10:00] walking "sideways" across the street while looking back at them with his face turned towards them. [T. 7 of 8, 8/23/83, 30:15; T. 8 of 8, 8/23/83, 18:40.] She had a clear view of his face. [T. 8 of 8, 8/23/83, 19:25.] Herrera was smiling and sticking a gun between his shirt and pants according to Farrell. [T. 7 of 8, 8/23/83, 30:15; T. 8 of 8, 8/23/83, 12:15, 17:20.] Martinez did not see Herrera handling a gun as he left the scene. After Herrera left, P. Arellanes and the two women ran to a nearby apartment to find a telephone, and then returned to the scene. [T. 5 of 8, 8/23/83, 3:00; T. 7 of 8, 8/23/83, 35:25.] The police were then arriving at the scene. P. Arellanes was described as hysterical and running around the scene. [T. 3 of 6, 8/24/83, 42:03; T. 8 of 8, 8/25/83, 6:33.] A spent 9 millimeter casing was found at the scene but apparently was moved slightly from its original location by a news reporter who kicked it at the scene. [Tape 6 of 8, 8/22/83, 8:33, 23:53, 42:48; Tape 3 of 8, 8/23/83, 4:45.] No gun was ever found, nor was the slug located that exited the backside of Lovato's head. [Tape 1 of 8, 8/23/83, 28:50; T. 2 of 8, 8/25/83, 6:45; T. 5 of 8, 8/25/83, 28:45.]

17. P. Arellanes was arrested for interference with a crime scene and taken to jail for awhile. [Tape 7 of 8, 8/22/83, 3:00; T. 5 of 8, 8/23/83, 3:00.] Lovato still had a slight pulse [tape 6 of 8, 8/22/83, 8:33] and was transported to the hospital where he later died after unsuccessful surgery. The bullet severed his spinal column and his carotid artery. [Tape 1 of 8, 8/23/83, 24:02; Tape 2 of 8, 8/23/83, 9:20, 16:15.]

18. P. Arellanes was later transported from the jail to the police station, where he called his cousin Robert Arellanes ("R. Arellanes"), to ask him the name of the man with whom P. Arellanes remembered having a prior altercation and whom he believed was the man who shot Lovato. [T. 5

of 8, 8/23/83, 26:00.] R. Arellanes was hesitant to get involved but then gave the Defendant's name to P. Arellanes. [T. 3 of 6, 8/24/83, 47:00; T. 5 of 6, 8/24/83, 15:00.] P. Arellanes provided this information to the police. [T. 7 of 8, 8/25/83, 38:00.] A photo lineup was presented to P. Arellanes and he picked out Herrera as the shooter. [T. 5 of 8, 8/23/83, 19:20.] P. Arellanes had two prior felony convictions – one for larceny and one for conspiracy to commit armed robbery, both in 1980. [T. 5 of 8, 8/23/83, 22:00.]

19. Photo arrays were presented to each of the two women, who also picked out Herrera as the man present at the scene of the shooting. [T. 2 of 6, 8/24/83, 3:15.] Farrell had not heard Herrera's name when she picked his photo out and did not know Herrera, but she had no trouble picking him out as the man present at the scene outside the bar that night. [T. 7 of 8, 8/23/83, 42:08.] She might have seen him on three prior occasions. [T. 8 of 8, 8/23/83, 25:20.] Martinez did not seem to have been acquainted with Herrera either.

20. R. Arellanes was also at El Nido that night but was sitting outside the bar in a car with a friend Julian Bustamante, when Herrera came out of the bar. [T. 3 of 6, 8/24/83: 18:00; T. 4 of 6, 8/24/83, 1:40, 7:07; T. 5 of 6, 8/24/83, 31:20, 33:00.] R. Arellanes had known Herrera for years. [Id.] Earlier in the evening R. Arellanes had been inside El Nido and had bought Herrera a beer and talked to Herrera for a short time. [T. 4 of 6, 8/24/83, 11:20, 15:30.] R. Arellanes did not pay attention to where Herrera went after Herrera left the bar. [T. 4 of 6, 8/24/83, 7:07.] R. Arellanes noticed Farrell, Martinez, P. Arellanes and Lovato each exit the bar. [T. 3 of 6, 8/24/83, 26:30.] R. Arellanes heard a shot, after seeing the two women followed by the two men leave the bar. His view was partially blocked by other parked cars. [T. 3 of 6, 8/24/83, 26:30; T. 4 of 6, 8/24/83, 33:00.] He saw Herrera with a gun running away from the scene and towards the car where R. Arellanes was

parked. [T. 5 of 6, 8/24/83, 3:39.] He described Herrera as handling and trying to put away an object that appeared to be a gun. [T. 3 of 6, 8/24/83, 26:30; T. 5 of 6, 8/24/83, 26:45.]] Herrera wore a 3-piece maroon suit. Herrera saw R. Arellanes in the parked car and slowed down. [T. 3 of 6, 8/24/83, 39:15.] Herrera then seemed to be acting like he had been shot. He waved at R. Arellanes as he passed his car and started running again. [Id.] R. Arellanes said that 30-40 seconds elapsed between when he heard the shot and saw Herrera. [T. 3 of 6, 8/24/83, 42:03.]

      21.     Bustamante testified that he saw the two men and two women leave the bar. [T. 5 of 6, 8/24/83, 33:00.] He knew the men but not the women. His view was partially obstructed. [Id.] He then heard a loud bang about one to five minutes after seeing the four talking. [T. 5 of 6, 8/24/83, 36:20.] Shortly after the "bang," Bustamante saw Herrera coming across the street towards the area where he and R. Arellanes were parked. [Id.] Bustamante had known Herrera since high school. [T. 5 of 6, 8/24/83, 34:40.] Bustamante did not see Herrera with a gun, but observed Herrera as he walked past their car and waved at them. [T. 5 of 6, 8/24/83, 40:00.] Herrera appeared to be holding his side as he continued to walk. [T. 5 of 6, 8/24/83, 41:00.] Neither R. Arellanes nor Bustamante saw the shot fired. [T. 6 of 6, 8/24/83, 1:00.]

      22.     Herrera was taken into custody several hours after the shooting. The police later obtained a search warrant to search Herrera's residence. They were looking for a 9 millimeter pistol or anything to do with a 9 millimeter firearm. [T. 1 of 8, 8/25/83, 10:55, 14:25, 16:40.] Police found and seized a 9 millimeter clip, a 9 millimeter live round and a 9 millimeter casing in a bedroom at the residence. [Id.] The State's crime lab expert testified that, after testing, he determined the fired cartridge casing found at the scene was identical to the casing seized at Herrera's residence. [T. 6 of 8, 8/25/83, 41:50; T. 7 of 8, 8/25/83, 1:55.] The police did not order any fingerprint analysis on

the evidence seized at Herrera's house. The evidence seized at Herrera's residence and testimony about the comparison of the casings were presented at trial [T. 5 of 8, 8/25/83, 18:00 - 22:44], and it is this evidence that was admitted in error due to the New Mexico Supreme Court's later ruling that the search warrant was invalid. Herrera argued that the seized ballistics evidence was "the only compelling evidence of Herrera's guilt."

23. After Herrera was taken into custody, a neutron activation analysis was performed to determine whether any gun powder residue was found on Herrera. Based on the analysis results, the State's expert testified that he could not say whether Herrera did or did not shoot a gun that evening. [T. 3 of 8, 8/25/83, 1:00, 3:15.] Herrera's expert testified that the test results were inconsistent with Herrera having washed his hands after the shooting and before the testing. [T. 1 of 6, 8/26/83, 9:30.] While Herrera's expert came close to testifying that Herrera did not shoot the gun that night, he conceded that the testing results could not be used to "prove" that fact because of the unaccounted period of time in between the shooting and Herrera's arrest. [T. 2 of 6, 8/26/83, 9:12-15:30, 30:20.]

24. During opening statement, Herrera's attorney informed the jury that Herrera would take the stand and testify that Herrera heard the argument between P. Arellanes and Nora Trujillo, heard P. Arellanes tell Trujillo that he was going to take her outside and slap the hell out of her, and that Herrera attempted to defend Trujillo against P. Arellanes. [T. 6 of 8, 8/23/83, 5:00.] Herrera (through argument of counsel only) claimed that he told P. Arellanes it was improper to hit a woman and ordered P. Arellanes to stop his disruptive behavior. Herrera also argued through counsel that P. Arellanes was actually the shooter and that Arellanes had fired at Herrera but missed and struck Lovato by mistake. [T. 7 of 8, 8/23/83, 6:20.] No one confirmed this story, not even Herrera, who

ultimately did not take the stand.[5] Moreover, no one testified to having seen P. Arellanes with a weapon that night. Nora Trujillo testified that she did not recall P. Arellanes saying anything to the effect that he was going to take her outside and slap her, nor did she remember seeing Herrera at the bar when she argued with P. Arellanes. [T. 3 of 6, 8/26/83, 32;55, 40:50.] Farrell observed the argument between P. Arellanes and Trujillo but did not see Herrera involved in it. [T. 7 of 8, 8/23/83, 17:17.] Only Elizabeth Valdez, called by Herrera, testified unconvincingly that she "thought" Herrera "stuck up" for Trujillo that night. [T. 4 of 6, 8/26/83, 17:50, 22:30.] A cocktail waitress testified that while she had observed the argument between P. Arellanes and Trujillo, she had not seen Herrera get involved in it at all. [T. 6 of 6, 8/24/83, 29:50.]

25. Another witness called by Herrera, Richard Royball, testified that he had seen R. Arellanes getting out of a car outside the Herrera home after the shooting but before the police executed the search warrant of the Herrera residence. [T. 5 of 6, 8/26/83, 26:10; T. 6 of 6, 8/26/83.] His testimony was offered to imply that P. Arellanes' cousin Robert planted the evidence that was found in the residence. However, Royball, a friend of Herrera's, never provided this information to the police, and did not come forward with it until the eve of trial. [Id.]

## Analysis

26. The standard by which the Court reviews the entire record is whether the errors at issue "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623, 631 (*quoting* Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253

[5]Habeas counsel for Herrera argued in his objections to the original recommended findings that P. Arellanes became "enraged over Mr. Herrera's interference in a fight Phillip had with Nora Trujillo earlier that evening, shot at Mr. Herrera, but ended up shooting his best friend." Counsel cited trial tape 7, 8/23/83 at page 55, but that citation merely contains Herrera's trial counsel's questioning of P. Arellanes to this effect. P. Arellanes denied these contentions in their entirety, and no witness confirmed them.

(1946). Thus, under this standard, habeas petitioners are not entitled to habeas relief based on trial error, unless they can establish that it resulted in "actual prejudice." Id. at 637.

27. The Brecht standard must be construed and applied in light of the Supreme Court's decision in O'Neal v. McAninch, 513 U.S. 432, 115 S.Ct. 992 (1995). Herrera, 301 F.3d at 1198. In O'Neal, the Court held that the habeas court should treat an error as if it affected the verdict where the judge is in grave doubt about whether the error is harmless. Id. (*citing* O'Neal, 513 U.S. at 435). O'Neal "ameliorated the effect of Brecht by ruling that when a habeas court is in grave doubt as to the harmlessness of a constitutional error, the petitioner is entitled to relief." Id. at 1199 (internal citation omitted).

28. Under Brecht and O'Neal, the task is not merely to determine whether there was sufficient evidence to convict in the absence of the error. Tuttle v. Utah, 57 F.3d 879, 884 (10th Cir. 1995). Rather, the task is to determine, in light of the entire record, whether the error so influenced the jury that this Court cannot conclude that the improperly admitted evidence did not substantially affect the verdict or that the Court has grave doubt as to the harmlessness of the error alleged. Davis v. Executive Director of Dep't of Corrections, 100 F.3d 750, 773 (10th Cir. 1996) (*relying on* Brecht, 507 U.S. at 638; Kotteakos, 328 U.S. at 776; O'Neal, 513 U.S. at 438), *cert. denied*, 520 U.S. 1215 (1997).

29. Put another way, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." O'Neal, 513 U.S. at 438. If the error did have "substantial influence" then the conviction cannot stand. Id.

30.     Thus, while the Court does not examine merely whether the remaining evidence was sufficient to convict the defendant in the absence of error, the Court does examine the remainder of the evidence presented at trial and whether there was "overwhelming" or "weighty" evidence of guilt. Brecht, 507 U.S. at 639 (evidence of guilt, while not overwhelming, was "certainly weighty"); Hoxie v. Kerby, 108 F.3d 1239, 1245 (10th Cir.) (error did not "tip the scale" in favor of guilt; instead, there was overwhelming evidence of guilt), *cert. denied*, 522 U.S. 844 (1997). *See* Samuels v. Mann, 13 F.3d 522, 527 (2d Cir. 1993) (noting that the weight of the prosecution's case is the most significant factor in determining whether a trial error was harmless), *cert. denied*, 513 U.S. 849 (1994).

31.     In this case, there was not just "weighty," but overwhelming evidence of Herrera's guilt.  P. Arellanes, an eyewitness to the shooting, testified that Herrera very quickly pulled out a black automatic gun directly in front of P. Arellanes and shot Lovato point-blank in the neck.  P. Arellanes also testified that Herrera pointed the gun at P. Arellanes after the shooting and threatened him to stay silent.  Farrell and Martinez were within feet of the shooting when they heard the shot, turned around and saw Lovato on the ground bleeding from a wound.  The shooting incident occurred within a very short time span of their seeing Herrera or a man approaching the group of four and Lovato falling to the ground wounded.  Herrera was the only other man seen approaching and leaving the crime scene within this period. Both Martinez and Farrell observed Herrera leaving the scene immediately after the shooting.  While Martinez did not see Herrera holding a gun, Farrell saw him trying to tuck a black handled weapon into his pants.  She had a clear view of his face.  P. Arellanes and both women had no trouble identifying Herrera as the man at the scene (or the shooter, in P. Arellanes' case) from a photo array.

32. R. Arellanes and Bustamante also had a partial view of the scene, at least immediately before and after hearing the shot. They each saw Herrera coming towards them after hearing the shot fired. Like Farrell, R. Arellanes saw Herrera handling what appeared to be a gun and trying to put it away. While Bustamante did not see the weapon, his testimony was consistent as to Herrera coming from the crime scene after the shot was fired, and acting as if Herrera had been shot.

33. While Herrera tried to put a different spin on the story, i.e., accuse P. Arellanes of the shooting, absolutely no one provided any convincing support for his version of the events. Indeed, not even Herrera supplied admissible testimony that Herrera interceded on behalf of Nora Trujillo, which purportedly infuriated P. Arellanes to the point of shooting at Herrera. Thus, Herrera's argument is flatly contradicted by overwhelming evidence to the contrary. Indeed, the weight of the evidence against him, stripped of the Fourth Amendment error, was substantial. *See* Samuels, 13 F.3d at 526 (weight of the prosecution's case is the most significant factor in determining whether the trial error was harmless). Here, the prosecution put on a cohesive, consistent picture of the incident in question. The few inconsistencies emphasized at great length by Defendant were either insignificant or understandable in the context of the traumatic shooting of Lovato.

34. In view of the strength of the above-discussed evidence and the implausibility of Herrera's version of the events, the Court concludes that the wrongly admitted evidence and testimony relating to the items seized at Herrera's residence could not have "tipped the scales" in favor of guilt. Herrera's guilt was well supported by the testimony of P. Arellanes and other witnesses at the scene.

35. Moreover, this trial lasted over five days in contrast to a short trial where trial errors may sometimes take on "greater significance." *See* Velarde v. Shulsen, 757 F.3d 1093, 1096 (10th

Cir. 1985) (presentation of both the state's and petitioner's evidence lasted only one morning; thus, improperly admitted evidence took on greater significance). In addition, while the wrongly admitted evidence was discussed through several witnesses presented by the State at trial, this Court does not find that the State emphasized the evidence disproportionately. Instead, in its opening and closing presentations, the State first underscored the testimony of witnesses at the scene, their observations related to the incident, and their subsequent identification of Herrera as the individual seen at the scene. [T. 4 of 8, 8/22/83, 33;26; T. 5 of 8, 8/22/83, 1:00-9:00; T. 1, 8/27/83, 13:45.] Only after the State discussed that evidence did it also discuss additional evidence, including the improperly admitted evidence. [T. 5 of 8, 8/22/83, 9:10-13:00.] Consistent with the approach of emphasizing the fact witnesses' testimony, the State called those witnesses first, including P. Arellanes, the two women, Robert Arellanes, and Julian Bustamante. While at least one police officer also testified early in the trial, he was not the officer responsible for executing the search warrant. Thus, it was not until the fourth day of trial, that Detective Juarros testified about his search of the residence and what was located, followed by testimony from Detective Mares. [T. 1 of 6, 8/25/83, 14:25; T. 5 of 6, 8/25/83, 18:00-28:45.] Even Juarros' testimony was not unduly emphasized by the State other than to say what was located. Mares similarly testified as to what was seized from the residence.

36. However, Herrera has mainly himself to blame for highlighting Mares' testimony about the evidence seized at his residence. Herrera insisted, apparently against the advice of his attorney and the Court, on conducting some his own cross-examination of State witnesses, including that of Detective Mares. During the cross examination of Mares, Herrera invited Mares to discuss at length and in great detail the casing found at the crime scene and the 9 millimeter evidence seized at his house. [T. 5 of 8, 8/25/83, 1:00-47:00; T. 6 of 8, 1:00-32:40.]

37.     In addition to Herrera's cross examination of Mares, the most damaging testimony regarding the improperly admitted evidence, was the State's direct examination of the crime lab expert.  The expert's testimony, while reasonably brief and to the point, was damaging in that he concluded that the casing found at the crime scene matched that which was found at Herrera's residence.  While this evidence may have had some effect on the jury's assessment, this is not dispositive in the harmless error analysis.  The Court need not find that the improperly admitted evidence had no real effect at all – but rather that its effect was not substantial and injurious. Samuels, 13 F.3d at 528.

38.     The Court here so finds.  The improperly admitted evidence did not have substantial or injurious effect on the jury's verdict.  This is true after a review of the record as a whole and in view of the overwhelming evidence of Herrera's guilt.  This is not a case where there is "grave doubt" or where it is "extremely difficult" to say whether the wrongfully admitted evidence had a substantial and injurious effect or influence on the jury's decision.  Thus, in light of the properly admitted testimony of a number of fact witnesses at the scene, including eyewitness P. Arellanes, and evidence that Herrera was the only other person clearly observed to have been at the scene shortly before and after the shooting, the Court recommends finding that the effect of the wrongfully admitted evidence was harmless under the Brecht standard.

**Recommended Disposition**

39. That Herrera's § 2254 petition [doc. 1] be denied, and that all of his claims be dismissed, with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge